IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| KRISTEN CARNEY and STEPHEN CARNEY, husband and wife, | ) ) ) | No. 80057-4-I |
| Appellants, | ) ) | DIVISION ONE |
| v. | ) ) | |
| PACIFIC REALTY ASSOCIATES, LP, d/b/a PACIFIC REALTY ASSOCIATES, A LIMITED PARTNERSHIP, a foreign limited partnership; and TVI, INC., d/b/a VALUE VILLAGE, a Washington corporation, | ) ) ) ) ) ) ) | UNPUBLISHED OPINION |
| Respondents, | ) ) | |
| MEAGAN NORRIS and JOHN DOE NORRIS, husband and wife; MARYSVILLE PLAZA ASSOCIATES, LLP, a limited liability partnership; SAFEWAY, INC., a foreign corporation; and EILAT MANAGEMENT CO., a Washington corporation, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

BOWMAN, J. — Kristen and Stephen Carney (collectively Carney) appeal summary judgment dismissal of their negligence claims against defendants Pacific Realty Associates LP d/b/a Pacific Realty Associates (Pacific Realty) and TVI Inc. d/b/a Value Village (TVI) for injuries sustained when Kristen[1] was struck by a van in a parking lot crosswalk near the entrance of a Value Village store at

___

[1] We use Kristen Carney's first name when necessary for clarity and mean no disrespect by doing so.

Citations and pin cites are based on the Westlaw online version of the cited material.

the Marysville Plaza shopping center. TVI operates the Value Village store and leases the commercial space from Pacific Realty. Carney argues that both Pacific Realty and TVI exercise control over the common-area parking lot and had a duty to protect Kristen from unreasonable harm in the crosswalk. Carney also argues that TVI owed Kristen a separate duty of safe ingress and egress from its place of business. We conclude that TVI and Pacific Realty did not exercise control over the parking lot sufficient to establish a duty to Kristen as possessors of the common area. But TVI owes a separate duty of safe ingress and egress to its business invitees regardless of whether it owns or has control of the property on which a known hazard exists. We affirm summary judgment dismissal of Carney's claims against Pacific Realty but reverse and remand for further proceedings related to TVI.

FACTS

Marysville Plaza is a shopping center owned by Marysville Plaza Associates LLP (MPA). In August 1973, lessor MPA and lessee Safeway Incorporated executed a "Master Lease" for a portion of the shopping center. Safeway agreed to lease a "building, or portion of the building," with "related improvements to be constructed" by MPA. The Master Lease contains provisions pertaining to the common areas of the shopping center, including its parking lot:

> 4. Common areas. Completion and expansion of shopping center. All those portions of the shopping center not shown as building areas . . . shall be common areas for the sole and exclusive joint use of all tenants in the shopping center, their customers, [and] invitees and employees . . . . Lessor agrees that, at lessor's expense, all common areas will be maintained in good

repair, kept clean and kept clear of snow and ice and adequately lighted when stores are open for business. . . . Lessor further agrees that . . . following completion of construction of any portion of the shopping center, the sizes and arrangements of said buildings and common areas[ ](including parking areas) will not be changed without lessee's written consent.

In exchange for MPA's control and maintenance of the common areas, Safeway and other shopping center tenants agreed to a common-area maintenance charge.

The Master Lease also provides that "at lessor's sole cost, risk and expense," MPA agrees to "construct on the common areas . . . all parking and service areas, sidewalks, driveways and related improvements." All construction was to be done "in accordance with plans and specifications" prepared at MPA's expense and by its designated architects.

In October 1982, Safeway executed a lease modification agreement and remodeled and expanded its Marysville Plaza store. The remodel included the addition of a diagonal handicap parking stall located next to the curb cutout that led to the north entrance of the store. MPA reviewed and approved the addition. At Safeway's request, MPA painted a crosswalk to the curb cutout in 1994.



In 1998, Safeway sublet its Marysville Plaza space to Shop & Save Inc. The sublease provides nonexclusive use of the common areas of the shopping center subject to the terms of the Master Lease and "to such reasonable rules and regulations as Sublessor [Safeway] may from time to time promulgate. Sublessor shall [also] have the right to use portions of the Common Area for any commercial purposes." The sublease includes a provision explicitly reserving master lessor MPA's obligation to maintain the common areas under the Master Lease as well as recourse for sublessee Shop & Save should MPA fail to fulfill its obligations:

> 4.1 Master Lessor's Obligation to Maintain. Sublessee hereby acknowledges that Master Lessor has the obligation under the Master Lease to maintain the Common Area, and Sublessor shall have no obligation to do so, except as expressly set forth herein. With respect to Master Lessor's obligation under the Master Lease to maintain the Common Area, Sublessor shall be required only to use reasonable efforts to cause Master Lessor to perform such obligation, and then only if Sublessor has actual notice of Master Lessor's failure to perform such obligations. If Master Lessor fails to perform such obligation, then Sublessee shall prepare and deliver to Sublessor a written notice specifying such failure to perform in reasonable detail. Sublessor shall then transmit such notice to Master Lessor. If such default or defaults as are specified in such notice remain uncured upon the expiration of the cure periods set forth in the Master Lease, then Sublessor shall perform such obligation of Master Lessor with reasonable diligence following receipt of written notice from Sublessee that Master Lessor has failed to do so.

In March 2000, Safeway assigned its interest in the Master Lease with MPA and its sublease with Shop & Save to Pacific Realty under a property acquisition agreement. TVI acquired Shop & Save in 2003. Pacific Realty then entered a sublease modification agreement with Shop & Save and TVI,

memorializing the assignment of interests. TVI now operates a Value Village store in the Marysville Plaza under the Master Lease and sublease.

On August 15, 2016, Kristen parked her car in the Marysville Plaza parking lot and used the painted crosswalk to walk toward the north entrance of Value Village. At the same time, Meagan Norris backed her minivan out of the diagonal handicap parking stall in front of the store. The diagonal orientation of the handicap parking stall in relation to the crosswalk required Norris to reverse into the crosswalk to exit the parking lot northward. Norris' minivan struck Kristen in the crosswalk. Kristen sustained a traumatic brain injury as a result of the collision.

Carney filed a personal injury complaint against Norris and MPA, alleging negligence and requesting damages for medical expenses, pain and suffering, loss of wages, and loss of consortium. They later amended the complaint to add Safeway, Pacific Realty, TVI, and Eilat Management Co.[2] as defendants.

Safeway moved for summary judgment dismissal of all claims with prejudice. The trial court granted the unopposed motion. Carney and Eilat Management entered a stipulation that dismissed all claims against Eilat with prejudice.

TVI and Pacific Realty also filed separate summary judgment motions to dismiss Carney's claims with prejudice. The trial court concluded that TVI and Pacific Realty owed no duty of care to Kristen and granted the motions. The trial court entered a partial final judgment under CR 54(b) and certified the case for

---

[2] Carney alleged MPA retained Eilat to provide property management services at Marysville Plaza.

appeal, finding that "[a] resolution on appeal of Plaintiffs' claims against TVI and [Pacific Realty] will be dispositive of a trial against Norris."

ANALYSIS

Carney appeals the trial court's summary judgment dismissal of her negligence claims against TVI and Pacific Realty. We review orders on summary judgment de novo. Kim v. Lakeside Adult Family Home, 185 Wn.2d 532, 547, 374 P.3d 121 (2016). "Summary judgment is properly granted when the pleadings, affidavits, depositions, and admissions on file demonstrate there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Folsom v. Burger King, 135 Wn.2d 658, 663, 958 P.2d 301 (1998) (citing CR 56(c)). The moving party bears the burden of proving there are no issues of material fact. Kim, 185 Wn.2d at 547. We consider all evidence and reasonable inferences in the light most favorable to the nonmoving party. Kim, 185 Wn.2d at 547. Summary judgment is appropriate "only if, from all the evidence, a reasonable person could reach only one conclusion." Folsom, 135 Wn.2d at 663.

To establish negligence, a plaintiff must show (1) the existence of a duty, (2) breach of that duty, (3) resulting injury, and (4) proximate cause. Ranger Ins. Co. v. Pierce County, 164 Wn.2d 545, 552, 192 P.3d 886 (2008). Summary judgment is proper if a plaintiff cannot meet any of these elements. Ranger Ins., 164 Wn.2d at 553. In a negligence action, "the threshold question is whether the defendant owes a duty of care to the injured plaintiff." Schooley v. Pinch's Deli

Mkt., Inc., 134 Wn.2d 468, 474, 951 P.2d 749 (1998). The existence of a legal duty is a question of law. Schooley, 134 Wn.2d at 474.

Duty as Possessor of Common Area

Carney argues both TVI and Pacific Realty owed Kristen a duty of reasonable care as possessors in control of the common-area parking lot where she was injured. TVI and Pacific Realty contend that MPA retained sole control over all Marysville Plaza common areas under the Master Lease. We agree with TVI and Pacific Realty.

A landowner has a duty to maintain common areas in a reasonably safe condition. Mucsi v. Graoch Assocs. Ltd. P'ship # 12, 144 Wn.2d 847, 854, 31 P.3d 684 (2001). As a general rule,

> where an owner divides his premises and rents certain parts to various tenants, while reserving other parts such as entrances and walkways for the common use of all tenants, it is [the owner's] duty to exercise reasonable care and maintain these common areas in a safe condition.

Geise v. Lee, 84 Wn.2d 866, 868, 529 P.2d 1054 (1975). But a landowner may not be liable for injury on its property if it has given exclusive control of the property to a lessee. Adamson v. Port of Bellingham, 193 Wn.2d 178, 184-85, 438 P.3d 522 (2019).

To determine premises liability, we look to "whether one is a 'possessor' of property, not whether someone is a 'true owner' (the titleholder) of property." Gildon v. Simon Prop. Grp., Inc., 158 Wn.2d 483, 496, 145 P.3d 1196 (2006). A "possessor" of land is

> (a) a person who is in occupation of the land with intent to control it or

7

(b)  a person who has been in occupation of land with intent to control it, if no other person has subsequently occupied it with intent to control it, or
(c)  a person who is entitled to immediate occupation of the land, if no other person is in possession under Clauses (a) and (b).

RESTATEMENT (SECOND) OF TORTS § 328E (AM. LAW INST. 1965); Ingersoll v. DeBartolo, Inc., 123 Wn.2d 649, 655, 869 P.2d 1014 (1994).

A person is in "control" of the land if that person has the authority and ability to take precautions to reduce the risk of harm to entrants on the land. Adamson, 193 Wn.2d at 187.  Control may be shared over certain areas of property.  Adamson, 193 Wn.2d at 187.  To determine control,

[w]e look to the specific terms of the agreement to see who had authority and ability to reduce risk of harm and whether there were temporal and practical limits on the lessee's possession such that the lessor is still liable as a possessor of land.

Adamson, 193 Wn.2d at 187.

Here, the governing leases establish MPA as a possessor of the common areas.  In section 4 of the Master Lease, MPA agreed to construct the common areas—including parking lots—at its expense.  The Master Lease also establishes that "all common areas will be maintained in good repair" by MPA and at MPA's expense.  Section 4.1 of the sublease explicitly affirms MPA's control of the common areas.  It provides that the "Master Lessor has the obligation under the Master Lease to maintain the Common Area, and Sublessor shall have no obligation to do so, except as expressly set forth herein."  Despite the plain language of the Master Lease, Carney argues that other lease provisions and the actions of TVI and Pacific Reality show that they share control of the common-area parking lot with MPA.

8

TVI

Carney contends that TVI owed Kristen a duty to protect her from harm in the crosswalk because "specific rights and responsibilities" granted to TVI under the leases give TVI the authority and ability to act with regard to the common area.  In support of their argument, Carney points to TVI's successful requests for repair and restriping of the parking stalls and fire lanes, replacement of burned out lightbulbs in the parking lot, removal of trailers from the back parking lot, repair of a loose concrete slab on the sidewalk in front of the store, and pothole repair.

TVI's requests for maintenance are not evidence of its authority over the common areas.  To the contrary, under the leases, TVI must make written requests for maintenance, and MPA will perform the work only if it approves the request.  TVI submits its written requests to Pacific Realty, who then forwards the requests to MPA.  For example, in March 2008, TVI notified Pacific Reality in writing that the parking lot needed repairs, restriping, and stenciling.  Pacific Realty forwarded the request to MPA, noting that "[a]s the Master Lessor of the Property, you are responsible for maintenance of the parking lot."  On another occasion, TVI e-mailed Pacific Realty to request repair of a "concrete slab that has come loose at the front of the Value Village."  Pacific Realty forwarded the information to MPA, who then scheduled the repair.

Carney also points to evidence that TVI and Pacific Realty collaborated on a plan for significant alterations to the parking lot to improve TVI's customer donation drop-off experience.  Carney asserts the collaboration is proof that TVI

could alter the parking lot without MPA's consent. While evidence showed that TVI and Pacific Realty worked with an architect to design a plan to modify the parking lot for a donation drop-off lane, the evidence also showed that TVI and Pacific Realty stopped short of implementing any changes without MPA's approval. Pacific Realty notified TVI by e-mail that "[w]e need to get this approved by the Master Lessor first." And during depositions, Pacific Realty confirmed that it advised TVI of the need for MPA's approval. Pacific Realty informed TVI that moving forward with construction before MPA's authorization "would be a violation of the master lease."

Finally, Carney contends that a lease provision restricting MPA from changing the common-area parking lot without TVI's written consent is evidence of TVI's control over the property. But the ability to veto changes to the parking lot proposed by MPA is not evidence of TVI's independent authority and ability to take precautions to reduce risk of harm. Carney provides no evidence that TVI could unilaterally change the common areas. MPA alone "had the requisite ability and authority to reduce the risk of harm to entrants such that it was" solely in control and possession of the property. Adamson, 193 Wn.2d at 188.

<u>Pacific Reality</u>

Carney contends that Pacific Reality is also a "possessor" of the parking lot and owed Kristen a duty of care. Carney argues that many of the same lease provisions that give TVI authority to act independently to reduce risk of harm also apply to Pacific Realty. Additionally, Carney argues that lease provisions giving Pacific Realty the ability to impose rules over the common area and to use the

common area for commercial purposes, as well as Pacific Realty's obligation under the leases to maintain the common areas if MPA fails to act, are evidence of Pacific Realty's control over the property.

Section 2.2 of Pacific Realty's sublease with TVI states, in pertinent part:

Sublessee's use of the Common Area shall be subject to such reasonable rules and regulations as Sublessor may from time to time promulgate. Sublessor shall have the right to use portions of the Common Area for any commercial purposes.

Although Carney cites these provisions as evidence of Pacific Realty's control over the common areas, the provisions only allow Pacific Realty to restrict how TVI uses the property and reserve the right to use portions of the property for its own commercial purposes. Nothing in these provisions of the sublease authorizes Pacific Realty to make unilateral changes to the property.

The sublease also requires Pacific Realty to maintain the common areas if MPA fails to perform its obligations under the lease:

If Master Lessor fails to perform such obligation [under the Master Lease to maintain the Common Area], then Sublessee shall prepare and deliver to Sublessor a written notice specifying such failure to perform in reasonable detail. Sublessor shall then transmit such notice to Master Lessor. If such default or defaults as are specified in such notice remain uncured upon the expiration of the cure periods set forth in the Master Lease, then Sublessor shall perform such obligation of Master Lessor with reasonable diligence following receipt of written notice from Sublessee that Master Lessor has failed to do so.

But this provision gives Pacific Realty only limited authority to act on notice of MPA's failure to perform needed maintenance after multiple requests. There is no evidence that Pacific Reality could change the common areas absent these conditions precedent. To the contrary, the evidence shows that Pacific Realty

11

halted plans to renovate the donation drop-off area of the parking lot to obtain

MPA's approval to make the changes. Pacific Realty is not a "possessor" of the

common area because it lacked sufficient "authority [over the area] and [the]

ability to reduce risk of harm." Adamson, 193 Wn.2d at 187.

Duty of Safe Ingress and Egress

Carney argues that TVI also owed a duty of safe ingress and egress from

its retail store to its business invitees. TVI claims that business owners do not

have a duty to ensure safe ingress and egress over adjacent land that they do

not control. TVI also argues that even if it had such a duty, it is not liable for

Kristen's injuries because the risk associated with using the crosswalk was "open

and obvious."

Proprietors of a store "have a duty to exercise reasonable care to keep

those portions of the premises used by their customers in a reasonably safe

condition, or to warn the customer-invitees of the dangerous condition." Baltzelle

v. Doces Sixth Ave., Inc., 5 Wn. App. 771, 774, 490 P.2d 1331 (1971). This

includes "the obligation to use ordinary care to keep the approaches, entrances

and exits in a reasonably safe condition for use of customers who are entering or

leaving the business." Baltzelle, 5 Wn. App. at 774. The duty to business

invitees of safe ingress and egress arises even if the proprietor does not own or

control the property on which the hazard is located. Rockefeller v. Standard Oil

Co. of Cal., 11 Wn. App. 520, 522, 523 P.2d 1207 (1974).

Carney relies on Rockefeller to support their argument that TVI owed a

duty of safe ingress and egress. In Rockefeller, the plaintiffs were injured when

the wheels of their pickup truck ran into a ditch located on property next to the entrance of a Standard Oil service station. Rockefeller, 11 Wn. App. at 520-21. Although Standard Oil did not own the property where the ditch was located, the ditch was within four feet of the entrance to its service station. Rockefeller, 11 Wn. App. at 520. The Rockefellers claimed Standard Oil knew the ditch was difficult to see and that it was negligent for failing to post warnings or provide adequate lighting to make the ditch visible to those entering the service station. Rockefeller, 11 Wn. App. at 521.

TVI argues that Rockefeller is distinguishable from this case. TVI contends that Standard Oil was liable for injuries caused by a hazard on property it did not control only because Standard Oil failed to replace a light on its own property, which contributed to the hazardous condition. But Rockefeller defines the duty of safe ingress and egress more broadly—"To incur liability, Standard Oil need not own or control the property on which the hazard was located, nor is it required that Standard Oil create the hazard." Rockefeller, Wn. App. at 522. Standard Oil's liability did not stem only from its failure to replace a light on its property as TVI asserts. Instead, liability arose from Standard Oil's failure to take any reasonable precautions to eliminate a known hazard to invitees entering its parking lot. Rockefeller, 11 Wn. App. at 522. We held that Standard Oil "should have taken reasonable precautions to eliminate [the hazard] by, for example, posting warnings or barriers or providing adequate illumination." Rockefeller, 11 Wn. App. at 522.[3]

---

[3] Emphasis added.

TVI also argues that unlike the hazardous ditch in <u>Rockefeller</u>, "the condition at issue in this case is located in the common area of a shopping plaza: a location MPA already signed up to be responsible for under the terms of the lease." But the true owner or entity in control of the property plays no role in assessing the retail owner's duty to ensure safe ingress and egress for its business invitees. TVI has a duty to its customer invitees to take reasonable precautions to eliminate foreseeable hazards to the ingress and egress from its store, even if it does not own or control the property on which the hazard is located. <u>Rockefeller</u>, 11 Wn. App. at 522.

Finally, TVI argues that even if it owed Kristen a duty of safe ingress and egress, it is not liable for her injuries because the hazard at issue was "open and obvious." A "landlord has no duty to protect a tenant or guest from dangers that are open and obvious" unless the landlord should have anticipated the harm. <u>Sjogren v. Props. of Pac. Nw., LLC</u>, 118 Wn. App. 144, 148-49, 75 P.3d 592 (2003). And "there is no duty to warn a business invitee about conditions of which the invitee has actual knowledge." <u>Barker v. Skagit Speedway, Inc.</u>, 119 Wn. App. 807, 813, 82 P.3d 244 (2003). TVI contends that Kristen had "actual knowledge" of the hazard because she frequented the shopping center. But a plaintiff's respective knowledge of a hazard and whether the hazard is open and obvious are generally questions of fact for a jury. <u>See</u> <u>Millson v. City of Lynden</u>, 174 Wn. App. 303, 313, 317, 298 P.3d 141 (2013); <u>Sjogren</u>, 118 Wn. App. at 149-50.

Here, several experts testified that the design of the handicap parking stall is dangerous to pedestrians because it requires drivers who want to drive north out of the parking lot to back into the crosswalk when pulling out of the space. The experts opined that TVI should have known about the poor design and sought to correct the problem. These material issues of fact as well as whether the hazard was open and obvious are properly decided by a jury.

We affirm summary judgment dismissal of Carney's claims against Pacific Realty but reverse and remand for further proceedings related to TVI's duty of safe ingress and egress. [4]

_____
Bummm, J

WE CONCUR:

_____          _____
Mann, C.J.                                                      Leach, J.

---

[4] TVI requests attorney fees and costs on appeal under RAP 14.2 (costs awarded to substantially prevailing party on appeal). A party is entitled to fees on appeal only if applicable law grants this right. RAP 18.1(a). A party must demonstrate the right to attorney fees and costs under private agreement, a statute, or a recognized ground of equity. Buck Mountain Owners' Ass'n v. Prestwich, 174 Wn. App. 702, 731, 308 P.3d 644 (2013). Because TVI fails to establish that it is entitled to attorney fees and costs on any ground, we decline its request.